UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARBARA MAHMUD<br><br>               Plaintiff,<br><br>  -against-<br><br>CITY OF NEW YORK; ALENA AMINOVA;<br>MICHAEL KENNEDY; NYPD Member of<br>the Service JANE DOE #1, in her individual<br>capacity; NYPD Members of the Service<br>JOHN DOES #1-5, in their individual<br>capacities,<br><br>               Defendants. | No. 20 Civ. 10259<br><br>**AMENDED  COMPLAINT<br>AND  JURY DEMAND** |

Plaintiff Barbara Mahmud, by and through her attorneys, Kaufman Lieb Lebowitz & Frick LLP, for her Complaint alleges as follows:

## PRELIMINARY STATEMENT

1.      The *hijab*—the Islamic headscarf—signifies a Muslim woman's connection to her faith and represents her devotion to Allah.

2.      Like many Muslim women, Plaintiff Barbara Mahmud believes that, as an adult woman, she must not uncover her hair in the presence of men outside of her immediate family.

3.      On October 6, 2020, predominantly male officers of the New York City Police Department ("NYPD") forced Ms. Mahmud to remove her hijab for post-arrest processing photographs.

4.     NYPD officers humiliated Ms. Mahmud in this way not once, but twice: Once for an "identification photograph" at the 60th Precinct,[1] and then again, mere hours later and well before Ms. Mahmud had even begun to process the trauma she had just endured, for a "booking photograph" at Central Booking.[2]

5.     They did this despite Ms. Mahmud's protests.

6.     They did this despite her tears.

7.     They did this despite her begging.

8.     Anxious and afraid of additional criminal charges, Ms. Mahmud gave in to the officers' demands after they told her the law required she remove her hijab and that she would not—*could* not—see a judge until she did so.

9.     The law requires no such thing.

10.    In fact, clearly established law prohibits the officers from doing precisely what they did.

11.    The officers' forced removal of Ms. Mahmud's hijab violated her religious and civil rights as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

12.    For the trauma she endured and the countless other Muslim women the NYPD subjects to this traumatizing and entirely unnecessary treatment, Ms. Mahmud now demands accountability.

---

[1] The 60th Precinct is located at 2951 West 8th Street, Brooklyn, New York. The division and physical premises of the 60th Precinct and are hereinafter both referred to as the "60th Precinct."

[2] New York City Police Booking ("NYCPB") is located at 120 Schermerhorn Street, Brooklyn, New York. The division and physical premises of NYCPB are hereinafter both referred to as "Central Booking."

## JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction over this action under 28 U.S.C.
§§ 1331 and 1343(a).

14.     Venue lies in the Southern District of New York under 28 U.S.C.
§ 1391(b)(1) because Defendant City of New York is a municipal corporation organized
under the laws of New York with its principal place of business in the Southern District
of New York and, upon information and belief, all defendants reside in New York State
in compliance with the New York Police Department's residency requirements.[3]

## PARTIES

15.     Plaintiff Barbara Mahmud is a 40-year-old woman who resides in
Brooklyn.

16.     Defendant City of New York (hereinafter the "City") is a municipal
corporation organized under the laws of New York with its principal place of business in
Manhattan.

17.     Defendant Alena Aminova is a Police Officer in the NYPD and, on
information and belief, is assigned to the 60th Precinct, located at 2951 West 8th Street,
Brooklyn, New York (hereinafter the "60th Precinct").

18.     Defendant Michael Kennedy is a Police Officer in the NYPD and, on
information and belief, is assigned to the 60th Precinct.

19.     Defendant Jane Doe #1 is an NYPD member of the service whose identity
is unknown at this time and who, on information and belief, is assigned to New York

---

[3] *See* Hiring Process, NYPD, https://www1.nyc.gov/site/nypd/careers/police-officers/po-hiring.page (last accessed
Dec. 4, 2020).

City Police Booking, located at 120 Schermerhorn Street, Brooklyn, New York (hereinafter "Central Booking").

20.     Defendants John Does #1-5 are NYPD members of the service whose identities are unknown at this time and who, on information and belief, are assigned to Central Booking.

21.     Defendants Aminova, Kennedy, Jane Doe #1, and John Does #1-5 are hereinafter referred to collectively as the "Individual Defendants."

22.     The Individual Defendants are sued in their individual capacities.

### JURY DEMAND

23.     Plaintiff demands a jury trial.

### FACTS

### *The Hijab*

24.     Ms. Mahmud wears a hijab pursuant to her Muslim faith. A hijab is a headscarf that covers the wearer's hair, ears, and neck, but leaves her entire face exposed. The Arabic word "hijab" stems from the word *hajaba*, meaning "to prevent from seeing;" in Islamic scholarship, "hijab" is also employed as a verb, to refer to broader notions of modesty, privacy, and morality. Ms. Mahmud's hijab is not held in place by needles or pins. Ms. Mahmud does not wear a *niqab* (face veil).

25.     For many observant Muslim women, including Ms. Mahmud, the practice of Islam mandates wearing one's hijab at all times when in the presence of men who are not immediate family.

26.     The hijab is core to Ms. Mahmud's religious practice. Like many other Muslim women, she describes feeling "naked" without it. It is an essential component of her personal identity.

### *Ms. Mahmud Is Forced to Remove Her Hijab at the 60th Precinct*

27.     On October 6, 2020, at approximately 11:30 a.m. three police officers from the 60th Precinct, including Officers Aminova and Kennedy, arrested and handcuffed Ms. Mahmud in her home in front of her husband and two young sons.

28.     The three officers transported Ms. Mahmud to the 60th Precinct, where they placed her in the women's holding cell at approximately 12:00 p.m.

29.     At approximately 2:00 p.m., Officer Aminova escorted Ms. Mahmud from her cell, and Officers Aminova and Kennedy proceeded to fingerprint Ms. Mahmud, a process with which Ms. Mahmud complied cooperatively.

30.     Officers Aminova and Kennedy then informed Ms. Mahmud they needed to take a "mug shot," and that Ms. Mahmud could not wear her hijab while they did so. On information and belief, this photo is commonly referred to as an "Identification Photograph" and is taken for purposes of creating a "Prisoner Movement Slip."

31.     Ms. Mahmud, who had never before been asked to remove her hijab in public, told Officers Aminova and Kennedy that she could not remove her hijab. Ms. Mahmud explained that her hijab is not just an ordinary article of clothing and that she wears it because of her religious faith. She explained that it was not appropriate for her to remove it for the photograph.

32.     Officer Aminova responded by telling Ms. Mahmud that the law required Ms. Mahmud to remove her hijab for the photo, and that Ms. Mahmud could not be processed or see a judge until she took off her hijab.

33.     In an effort to be cooperative, Ms. Mahmud pushed her hijab back from her cheeks and hairline, revealing approximately one inch of her hair, and asked whether that would be a sufficient accommodation to the officers.

34.     Officer Aminova said that it would not be. In an apparent contradiction of her earlier statement, Officer Aminova then told Ms. Mahmud that the judge assigned to Ms. Mahmud's case would not accept any photo of Ms. Mahmud in her hijab and that, were the judge to see such a photo, that would reflect poorly on Ms. Mahmud's legal case.

35.     Ms. Mahmud begged Officers Aminova and Kennedy not to make her remove her hijab. She explained that her religious beliefs forbid her from removing her hijab in the presence of unrelated men and pointed out that the place the officers were asking her to take the photo was in plain view of the men's holding cell.

36.     The officers did not relent, nor did they agree to take the photo in another location outside of the view of the men's cell.

37.     Distraught and fearing further criminal charges if she did not capitulate, Ms. Mahmud eventually removed her hijab for the photo. She asked a prisoner in the men's cell to turn and face a wall as the officers photographed her, and he respectfully agreed.

38.     After the photograph was taken, Ms. Mahmud returned to her holding cell in a state of shock. She immediately began sobbing uncontrollably, leading fellow female prisoners to hug and comfort her.

39.     At approximately 7:30 p.m. Ms. Mahmud was transferred to Central Booking alongside other female prisoners and the male prisoner who had agreed to turn away during her photos. Sitting next to this man in the tightly packed car ride to Central Booking, Ms. Mahmud felt humiliated and ashamed. She could not stop her hands from shaking.

### *Ms. Mahmud Is Again Forced to Remove Her Hijab at Central Booking*

40.     Soon after arriving at Central Booking, Ms. Mahmud was removed from her holding cell, fingerprinted, and again told to remove her hijab for another photo. On information and belief, this photo is commonly referred to as a "Booking Photograph."

41.     Ms. Mahmud had thought her trauma was over, and at this news she immediately broke down and began crying.  Through her tears, Ms. Mahmud explained to a female police officer, Jane Doe #1, that she had been photographed with her hijab removed earlier that night, and she pointed to those exact photos on Jane Doe #1's desk.

42.     To Ms. Mahmud's dismay, these photos were lying face up and in plain view of the male officers in the room, John Does #1-5.

43.     Witnessing Ms. Mahmud's distress, a male Muslim officer, John Doe #1, approached. He told Ms. Mahmud that he understood how she felt but that "the law is the law" and that she needed to remove her hijab in order to see a judge.

44.     After begging and proposing potential accommodations, including partially pushing her hijab up to reveal only one inch of her hairline, Ms. Mahmud once again capitulated to the officers' relentless demands and removed her hijab.

45.     Distressed and humiliated, Ms. Mahmud then spent the entire night and most of the next day in a holding cell with fifteen other women. In this cramped space, where it was impossible to observe any measure of social distancing, Ms. Mahmud feared catching COVID-19. She worried she would become extremely sick, die, and face judgment so soon after violating her religious requirements.

### *Ms. Mahmud's Mental Health Rapidly Declines Following Her Arrest*

46.     Ms. Mahmud has struggled with depression, anxiety, insomnia, and post-traumatic stress disorder ever since she was fifteen years old, following a difficult and

tumultuous childhood with an abusive father. For many years, Ms. Mahmud has attended therapy and taken medications to treat these conditions.

47. Earlier this year, Ms. Mahmud ceased her medications under her psychiatrist's close monitoring. She felt she had made tremendous strides in therapy and had long wanted to stop taking medication, in large part because she believed the "haze" the side effects created interfered with her religious practice.

48. Before her arrest in October, Ms. Mahmud was able—for the first time in years—to live her life without requiring medication to control her depression and anxiety. She was immensely proud of her success, particularly because she managed to maintain her mental health despite the loss of family members to COVID-19 and the omnipresent stresses of life in quarantine.

49. As a result of the traumatic experience of being forced to remove her hijab twice during her arrest processing, Ms. Mahmud's psychiatrist restarted her on her medications.

50. Ms. Mahmud's experience during her arrest has made her increasingly distrustful of, and uncomfortable around, men. These feelings have rekindled the memories of her abusive father that she had previously been so successful in overcoming.

51. Since her arrest, Ms. Mahmud has been haunted by the fact that photos of her without her hijab are stored in an online database and in her paper file, where they may be accessed by male police officers and even members of the public.

52. Ms. Mahmud now worries every time she hears a siren or a knock at her door, and wonders whether, if she or one of her children are ever injured, she will be able to bring herself to call 911.

### *NYPD Policy Forced Ms. Mahmud to Violate Her Religious Beliefs*

53.     The blame for the trauma Ms. Mahmud experienced does not rest solely on the badges of the Individual Defendants.

54.     On March 2, 2015, the NYPD implemented Interim Order 29. Patrol Guide 208-03, effective January 16, 2018, and Patrol Guide 208-07, effective March 2, 2015, implement the changes set forth in Interim Order 29.

55.     In theory, Interim Order 29 provides that an identification photograph may be taken while an arrestee wears their religious head covering, and that arrestees who refuse to remove their religious head coverings for booking photographs are to be transported to the Mass Arrest Processing Center "so that an arrestee can remove their religious head covering and have their photograph taken in private" by a member of the same gender.

56.     In reality, long after Interim Order 29 was issued and the patrol guide amended, the NYPD continued to force Muslim women like Ms. Mahmud to remove their hijabs against their will for both identification and booking photographs—all while in front of male NYPD officers and other males outside their immediate family.

57.     The City has long been aware that NYPD officers routinely violate Interim Order 29 and force Muslim women to remove their hijabs for post-arrest photos.

58.     For example, in February 2018 the City reached a settlement of $60,000 for each of three Muslim women who had their hijabs removed by NYPD officer for

post-arrest photos.[4] Many other Muslim women have brought similar claims since the

NYPD issued Interim Order 29 and have similarly settled with the City.[5]

59.     Despite being on notice that their officers frequently violate Interim Order

29, the widespread practice of the NYPD and City has long been to ignore these

widespread violations and to leave these well-documented violations wholly

unaddressed.

60.     Pursuant to this practice, NYPD officers have routinely forced Muslim

women, like Ms. Mahmud, to remove their hijabs for post-arrest photographs without

consequence, even when doing so violates arrestees' sincerely held religious beliefs.

61.     The substantial burden this policy places on religious practice is directly

prohibited by the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §

2000cc et seq. ("RLUIPA"). As federal courts have recognized, "[a] Muslim woman who

must appear before strange men she doesn't know, with her hair and neck uncovered in

a violation of her religious beliefs, may feel shame and distress. This is precisely the kind

of 'mischief' RLUIPA was intended to remedy."[6]

62.     This policy is also wholly unnecessary. Law enforcement agencies across

the country, including numerous police departments, the United States Department of

---

[4] *See J.H. v. Bratton*, 248 F. Supp. 3d 401, 414 (E.D.N.Y. Mar. 31, 2017); *see also* Christine Hauser, *Women Forced to Remove Hijabs for Mug Shots Settle With New York City* N.Y TIMES, Feb. 28, 2029, available at: https://www.nytimes.com/2018/02/28/nyregion/muslim-hijab-nypd.html

[5] *See, e.g., G.E. v. City of New York*, 2017 WL 4357340 (E.D.N.Y. Sept. 29, 2017); *Soliman v. City of New York*, 2017 WL 1229730 (E.D.N.Y. Mar. 31, 2017); *Clark et al. v. City of New York*, No. 18 Civ 02335 (S.D.N.Y. 2018); *Elsayed et al. v. City of New York et al,* No. 18 Civ 10566 (S.D.N.Y. 2020).

[6] *Khatib v. County of Orange*, 639 F.3d 898, 907 (9th Cir. 2011) (Gould, J., concurring)

State,[7] United States Citizenship and Immigration Services,[8] and New York's own Department of Motor Vehicles[9] all permit persons having their photos taken for official government purposes to retain their hijabs or other religious head coverings.

63.     The nonnecessity of the trauma Ms. Mahmud endured on October 6, 2020 is further underscored by recent actions taken by the City, which demonstrate that the City could have readily prevented Ms. Mahmud's ordeal had it only opted to do so.

64.     After years of inconsistently applying Interim Order 29 and pretending to have already remedied the very problem it continued to create, the City recently recognized the harm its policy causes to Muslim women like Ms. Mahmud and agreed to make substantial changes to its current practices.

65.     In partial settlement of the claims *Clark et al v. City of New York*, No. 18 Civ 02335 (S.D.N.Y. 2018) and *Elsayed et al v. City of New York et al,* No. 18 Civ 10566 (S.D.N.Y. 2020), the City agreed to, among other things, implement material changes to the patrol guide and training of NYPD officers; provide private spaces for searching and photographing arrestees who wear religious head coverings; and report annually on the number of arrestees whose religious head coverings are removed for purposes of photographing.

---

[7] *See United States Department of State Photo Requirements,* available at: *https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/photos.html*

[8] *See* July 23, 2012, USCIS Policy Memorandum, *USCIS Policy for Accommodating Religious Beliefs during Photograph and Fingerprint Capture,* (permitting applicants for passports and other documents to wear religious garments, including the hijab, while having their photos taken), available at: https://www.uscis.gov/sites/default/files/document/memos/Accommodating%20Religious%20Beliefs%20PM.pdf

[9] *See* 15 CRR-NY 3.8 ("Photographic diver licenses") (permitting applicants for driver's licenses to wear religious garments, including the hijab, while having their photos taken)

66.     The City's ability and willingness to undertake these reforms—without sacrificing or undermining the NYPD's law enforcement function—demonstrates that the practice to which Ms. Mahmud was subjected was not necessary to achieve any compelling interest on the part of the City.

67.     This agreement, entered on November 5, 2020, represents too little too late for Ms. Mahmud.

## CAUSES OF ACTION

### FIRST CLAIM
### 42 U.S.C. § 1983: First and Fourteenth Amendments
### Free Exercise
### Against Defendant Aminova and Defendant Kennedy

68.     Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

69.     42 U.S.C. § 1983 prohibits any person acting under color of state law, custom, or usage to deprive a citizen of rights secured by the Constitution.

70.     Under the First Amendment to the Constitution of the United States, enforceable against the States through the Due Process Clause of the Fourteenth Amendment, Plaintiff has a clearly established right to freely exercise her religion.

71.     By forcing Plaintiff to remove her hijab for post-arrest photographs at the 60th Precinct on October 6, 2020 Defendants Aminova and Kennedy deprived Plaintiff of her right to freely exercise her religion in contravention of the Free Exercise Clause.

72.     At all relevant times, Defendants acted under color of state law.

73.     The conduct of Defendants was willful, wanton, and reckless.

74.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff sustained damages, and suffered and continues to

suffer, mental anguish, physical and emotional distress, humiliation, and embarrassment.

75.    Defendants Aminova and Kennedy are liable to Plaintiff under 42 U.S.C. § 1983 for the damages hereinbefore alleged.

**SECOND CLAIM**
**42 U.S.C. § 1983: First and Fourteenth Amendments**
**Free Exercise**
**Against Defendant Jane Doe #1 and Defendants John Does #1-5**

76.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

77.    42 U.S.C. § 1983 prohibits any person acting under color of state law, custom, or usage to deprive a citizen of rights secured by the Constitution.

78.    Under the First Amendment to the Constitution of the United States, enforceable against the States through the Due Process Clause of the Fourteenth Amendment, Plaintiff has a clearly established right to freely exercise her religion.

79.    By forcing Plaintiff to remove her hijab for post-arrest photographs at Central Booking on October 6, 2020 Defendant Jane Doe #1 and Defendants John Does #1-5 deprived Plaintiff of her right to freely exercise her religion in contravention of the Free Exercise Clause.

80.    At all relevant times, Defendants acted under color of state law.

81.    The conduct of Defendants was willful, wanton, and reckless.

82.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff sustained damages, and suffered and continues to suffer, mental anguish, physical and emotional distress, humiliation, and embarrassment.

83.     Defendant Jane Doe #1 and Defendants John Does #1-5 are liable to Plaintiff under 42 U.S.C. § 1983 for the damages hereinbefore alleged.

**THIRD CLAIM**
**42 U.S.C. § 1983: Fourth and Fourteenth Amendments**
**Failure to Intervene**
**Against Defendant Aminova and Defendant Kennedy**

84.     Defendants Aminova and Kennedy deprived Plaintiff of her constitutional rights under color of law and failed to intervene in aforementioned deprivations despite having an opportunity to do so.

85.     On October 6, 2020, Defendants were aware of multiple violations of Plaintiff's constitutional rights, had a reasonable opportunity to intervene, and chose not to do so in contravention of clearly established law, proximately causing injury to Plaintiff.

86.     At all relevant times, Defendants were acting under color of state law.

87.     The conduct of Defendants was willful, wanton, and reckless.

88.     Defendants Aminova and Kennedy are liable to Plaintiff under 42 U.S.C. § 1983 for the damages hereinbefore alleged.

**FOURTH CLAIM**
**42 U.S.C. § 1983: Fourth and Fourteenth Amendments**
**Failure to Intervene**
**Against Defendant Jane Doe #1 and Defendants John Does #1-5**

89.     Defendant Jane Doe #1 and Defendants John Does #1-5 deprived Plaintiff of her constitutional rights under color of law and failed to intervene to prevent the aforementioned deprivations despite having an opportunity to do so.

90.     On October 6, 2020, Defendants were aware of multiple violations of Plaintiff's constitutional rights, had a reasonable opportunity to intervene, and chose

not to do so in contravention of clearly established law, proximately causing injury to Plaintiff.

91.     At all relevant times, Defendants were acting under color of state law.

92.     The conduct of Defendants was willful, wanton, and reckless.

93.     Defendant Jane Doe #1 and Defendants John Does #1-5 are liable to Plaintiff under 42 U.S.C. § 1983 for the damages hereinbefore alleged.

**FIFTH CLAIM**
**Religious Land Use and Institutionalized Persons Act**
**42 U.S.C. § 2000cc**
**Against Defendant City of New York**

94.     Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

95.     The RLUIPA provides: "No government shall impose a substantial burden of the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person (1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000cc-1(a)(1)-(2).

96.     Plaintiff is a "person" as defined under the RLUIPA. *See* 42 U.S.C. § 2000cc-1(a) and 42 U.S.C. § 1997(3).

97.     Plaintiff's decision to wear a hijab constitutes a sincerely held religious belief.

98.     At all relevant times, Defendant City met the definition of "government" under the RLUIPA. *See* 42 U.S.C. § 2000cc-5(4)(A)(i)-(iii).

99.    At all relevant times, the locations where the NYPD took Plaintiff's photographs, including the 60th Precinct, located at 2951 West 8th Street, Brooklyn, New York, and Central Booking, located at 120 Schermerhorn Street, Brooklyn, New York were and are federally-funded "institutions" as defined under the RLUIPA and the Civil Rights of Institutionalized Persons Act of 1980, 42 U.S.C. § 1997(1)(B)(ii)-(iii).

100.    Plaintiff was "residing in or confined to [an] institution[]" as that term is defined under the RLUIPA when the events alleged above occurred.

101.    Defendant City's actsm omissions, policies, and/or customs substantially burdened Plaintiff's religious exercise by forcing her to remove her hijab while residing in or confined to the 60th Precinct and Central Booking.

102.    Defendant City's acts, omissions, policies, and or customs do not further a substantial government interest.

103.    Defendant City's acts, omissions, policies, and/or customs are not the least restrictive means of furthering a compelling government interest.

104.    As a direct and proximate result of Defendant's wrongful acts, omissions, policies, and/or customs, Plaintiff sustained damages, and has suffered and continues to suffer mental anguish, physical and emotional distress, humiliation, and embarrassment.

**SIXTH CLAIM**
**42 U.S.C. § 1983: First and Fourteenth Amendments**
**Municipal Liability**
**Against Defendant City of New York**

105.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

106.    Defendant City of New York has a policy, custom, or usage of forcing Muslim women to remove their hijabs for post-arrest photos, and/or has exhibited deliberate indifference to the known risk of constitutional injury occasioned by the NYPD's ongoing failure to accommodate the religious exercise of Muslim women whose religious beliefs prohibit them from removing their hijab for photographs during arrest processing.

107.    The City's policy, custom, usage and/or deliberate indifference was a moving force behind the violation of Plaintiff's First and Fourteenth Amendment rights and proximately caused Plaintiff's injuries.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court grant the following relief:

A.    Compensatory damages in an amount to be determined at trial;

B.    Punitive damages against all Defendants except the City of New York in an amount to be determined at trial;

C.    Reasonable costs and attorneys' fees under 42 U.S.C. § 1988;

D.    Pre- and post-judgment interest to the fullest extent permitted by law; and

E.    Any additional relief the Court deems just and proper.

Dated:        December 4, 2020
              New York, New York

                              KAUFMAN LIEB LEBOWITZ
                              & FRICK LLP

                              /s/ David A, Lebowitz___
                              David A. Lebowitz

                              10 E. 40th Street, Suite 3307
                              New York, New York 10016
                              (212) 660-2332
                              dlebowitz@kllf-law.com

                              *Attorneys for Plaintiff*

17